## COUNTY OF ESSEX,

### MARCH TERM, 1842.

[Continued from Vol. 14, page 490.]

---

#### PRESENT.

Hon. CHARLES K. WILLIAMS, Chief Judge.
Hon. STEPHEN ROYCE, } Assistant Judges.
Hon. MILO S. BENNETT, }

---

### JAMES HOWARD v. ABEL EDGELL AND HORACE A. EDGELL.

#### IN CHANCERY.

Although mere inadequacy of consideration in a contract will not, of itself, substantiate a charge of fraud, yet when *gross*, and connected with other circumstances of a suspicious character, it may furnish sufficient ground to induce a court of chancery to rescind the contract.

Arbitrators, to whom is submitted a question in reference to the relative value of property, must, in their appraisal, keep strictly within the terms and requirements of the submission; and if they vary from, or exceed, the powers conferred upon them, their award will be void.

2

Howard *v.* Edgell et al.

Where the parties agreed to change farms, and submitted to appraisers to determine the amount which should be paid as the difference between them, and it was provided in the submission that the value of the orator's farm should be called $5000, and that, if, in the opinion of the appraisers, the orator's farm was overvalued, or undervalued, the defendant's farm should be valued in the same proportion, and the appraisers, in making their award, ascertained the *real value* of the farms, and hence deduced the difference to be paid, without regard to the value fixed for the orator's farm in the submission, it was held that the award was void, as not having followed the submission, and would be set aside by a court of equity.

THIS was a bill brought to set aside a contract made between the parties for an exchange of lands.

The orator set forth, in his bill, that, in July, 1835, he contracted to purchase of Joseph Fry, of Concord, a farm in said town at the price of $3000, and made several payments towards the purchase money, and took a bond from said Fry, conditioned, that, on payment of the last instalment of the purchase money, which was made payable in April, 1843, the said Fry should execute to the orator a warrantee deed of the premises, and that the orator entered into possession of said premises under said contract, and retained the possession thereof until the time of bringing this bill, and had, while in possession, made great and valuable improvements upon the farm and buildings, amounting to about the sum of $700; and that, previous to the eighth day of May, 1839, the orator was the owner of another tract of land in the east part of said Concord, of the value of $500.

The orator farther alleged, that on said eighth day of May, 1839, and at several times previous, the defendants represented to him that they were the owners of five farms in Charleston, in the County of Orleans, which they would exchange for the orator's lands in Concord, and that they would give to the orator good warrantee deeds of three of said farms, and that the defendant Horace A. Edgell would give a quitclaim deed of one of said farms, known as the "School Lot," and that the defendant Abel Edgell would give a quitclaim deed of the other of said farms, known by the name of the "Upper Melendy Lot"; that the said Abel said that that lot had been conveyed to him by a quitclaim deed, and that both of the defendants falsely

and fraudulently declared to the orator that the said Abel had a good and perfect title to that lot, that there was no dispute about said title, that no one claimed the lot but said Abel, and that a quit-claim deed from the said Abel to the orator would vest in the orator the absolute title to said lot in fee simple ; and that the orator, not knowing to the contrary thereof, but relying upon the said representations and affirmations made to him by the defendants, was thereby induced to enter into a contract, in writing, with said Horace, which was in these words ; —

" This agreement, entered into this day between James Howard, 'of the one part, and Horace A. Edgell, of the other part, witnesseth, '—That the said Howard, of the one part, has sold to the said Edgell 'all his land in Concord, consisting of two hundred acres this side 'of the pond, which he now lives on, and one hundred acres situated '.on the west side of the pond, likewise one hundred acres lying in 'the east part of said town of Concord, with all the betterments, 'improvements and buildings thereon situated; the said Howard is 'to give a good and sufficient title of the same, on demand; this 'agreement entered into for the above mentioned land, the value of 'which is called five thousand dollars; the payment for the above 'land is to be made as follows. The said Howard is to take of said 'Edgell five farms in Charleston, Vermont, two of which were re-'cently purchased of B. Pike, Esq., two by my father of S. Gaskill, 'and the remainder is called the "Allen farm," or the "Weeks lot," '—it being all the land which said Edgell owns in said town,— 'which I, the said Edgell, agree to give a warrantee deed of, except 'the "School Lot" and the "upper Melendy lot ;" these two lots I am 'to give a quitclaim deed of. The land at said Charleston is to be 'appraised by the following men, viz. Isaac Denison, Esq., Burke, 'Albert Lawrence, Charleston, and Capt. David Moulton, Concord ; 'the price of said land is to be in proportion to the price of said 'Howard's, which is five thousand dollars. If the said Howard's 'land is under-valued, or over-valued, the said Edgell's shall be val-'ued in the same proportion, and the appraisers are to take into con-'sideration that the said Howard is to have the use of all the land, 'both in Concord and Charleston, the present season, and is to leave, 'or give possession, the first of April next. Should there be found a

' difference in the value of said property, the difference is to be paid
' on demand.   In witness whereof we have hereunto set our names
' and seals this eighth day of May, 1839.

(Signed)    "James Howard," (Seal)<br>
"Horace A. Edgell," (Seal)

' Attest, Oliver Chamberlin,

   ' Abel Edgell."

The orator farther alleged, that, about the 19th day of May, 1839, the said Isaac Denison, Albert Lawrence and David Moulton met at Charleston to appraise the said five farms, and had put into their hands the sealed agreement, above set forth, as their authority and guide in making said appraisal; that, after having examined the lands in Charleston, the, appraisers, on the 21st day of May, 1839, came to Concord, for the purpose of examining the orator's lands; that, in the course of that day, the said Isaac Denison had many private conversations with the said Abel Edgell, and after this the said Abel, or Horace, or both of them, pretended to doubt whether a valid award could be made concerning land, whereupon it was proposed by the said Denison, under pretence of preventing litigation between the parties, and of his own accord, or at the request of Abel Edgell, that deeds should be written of all the lands that were, by the agreement, to be exchanged, and that they should be properly executed and acknowledged by the respective parties, and be deposited with the appraisers, to be held by them until they had made and declared their appraisal, and that then, and not before, the deeds of the orator should be delivered to said Horace, and the deeds on the other part be delivered to the orator; that the orator and the said Horace A. Edgell mutually assented to this proposition, and that, accordingly, the said Denison wrote, and the orator executed, a warrantee deed of his Fry farm, and a bond to procure a deed of his land in the east part of Concord; that, at the same time, the said Denison wrote, and Abel Edgell executed, one of the warrantee deeds, which, by the agreement, were to be given by the said Abel, also a bond to procure from one Gaskill, in whom the title then was, a good and sufficient warrantee deed of the other lot, of which, by the agreement, said Abel was to give a warrantee deed, and also a quitclaim deed of the " Upper Melendy lot," above men-

tioned ;—and the orator averred that the said Abel had been before informed, and then knew, that he had no title whatever to the " Upper Melendy lot," but that he concealed this fact from the orator, and, on the contrary, represented his title to be good, and thereby induced the orator to accept of a quitclaim deed of said lot ;—and that Horace A. Edgell then executed to the orator a warrantee deed of one of the lots which he owned, and a quitclaim deed of the " School Lot," so called ;—and the orator averred that at that time the lease-hold title of said Horace to said " School Lot " had become forfeited by reason of the non-payment of rent, and that this fact was known to said Horace, but that he concealed it from the orator.

And the orator alleged that he assented to said proposition, made by said Denison, wholly with a view of thereby performing his agreement entered into with Horace A. Edgell, and that no request was ever made to him to vary the terms of said proposition, and that he never assented to any substitution of Abel Edgell in said agreement in place of said Horace, nor ever agreed to any submission with said Abel Edgell, nor ever consented to receive said Abel debtor for any difference that might be found by the appraisers in his favor between the said lands, but that, through *fraud, accident,* or *mistake,* the deed and bond executed by the orator were made running to said Abel Edgell instead of Horace A. Edgell; and he averred that no award was ever made by the appraisers between himself and Horace A. Edgell, in pursuance of the submission contained in the agreement of May 8, 1839, and that any award made by them, purporting to be an award between himself and Abel Edgell, was made without any submission, or agreement, to support it, and that whatever award was made was procured by the said Abel, or said Horace, by improper influences used with the appraisers.

The orator farther alleged, that, while the appraisers were at Charleston, Abel Edgell with a view to procure an unfair appraisal of one of the lots owned by him, which was a swamp, and of little or no value, procured one Saunders to offer the orator $300 for said lot, that said Abel might inform the appraisers of such offer, and thereby induce them to appraise said lot far above its real value,

and that the said Abel did afterwards, and before the appraisal was made, inform two of the appraisers that such an offer had been made to the orator; also that the said Abel endeavored to induce one Prescott to offer him $500 for another of said lots, saying that he, Prescott, would not be obliged to take the land, and that the offer would be an advantage to him, the said Abel, and induce the appraisers to think that the said lot was valuable.

The orator farther alleged, that, after the said deeds and bonds had been executed and delivered to the appraisers, the said Denison, after having another private conversation with Abel Edgell, came into the room where the said Abel and the orator then were, and brought two papers, which he said were for them respectively to sign; that Abel Edgell signed the paper which was handed to him, without asking any questions, and that the orator signed the other paper, which was handed to him, without inquiring, or knowing, what it was, but supposing that the papers provided for some penalty in case either party refused to abide by the appraisal which was about to be made; that it appeared afterwards that these papers were notes, for $1000 each, one of which was intended to be indorsed down by the appraisers to the amount due from that party as the difference between lands, and the other to be given up to the party signing it, but that the orator had no idea at the time that the papers were of that character, or were notes,—and that, claiming as he did that there was $3000 difference between the lands, he would never knowingly have consented to the execution, for such a purpose, of a note for only $1000.

The orator farther alleged that the said Denison, after he had obtained the said two notes, carried them to the two other appraisers, and told them that the orator did not consider that there would be much difference in the appraised value of the lands, and that, if the orator had thought there was a difference of three or four thousand dollars, he would never have consented that a note of only $1000 should be given by said Abel to secure said difference; that the said Denison farther represented that the orator's land did not consist of near the number of acres mentioned in the agreement of May 8, 1839, and that the said Abel would not be satisfied, unless they reduced the number of acres and the estimated value; that all this

was represented by said Denison, without any notice to the orator that the estimated number of acres, or their estimated value, were at all in question; that Denison, by his artful management, induced the other appraisers to concur with him in making an indorsement of $633,33 on the note signed by Abel Edgell, leaving due thereon the sum of $366,67 ; and that the appraisers then delivered to Abel Edgell the deed and bond executed by the orator, and delivered to the orator the deeds and bond which had been executed by Abel Edgell and Horace A. Edgell respectively, together with his own note, executed as above stated, and the note of Abel Edgell, indorsed down to the sum of $366,67, as above set forth.

But the orator alleged that the agreement, executed between himself and Horace A. Edgell, May 8, 1839, had not been disposed of by the appraisers, but had been left by them in full force against him, and that 'Horace A. Edgell had never in any manner discharged nor executed any release of the same; and he claimed that the appraisers had not, in their appraisal followed the terms of the submision contained in that agreement, and that whatever appraisal they had made was absolutely void, as well for this cause, as for the fraudulent and collusive practices made use of in obtaining it.

And the orator charged that the said deed and bond, by him executed, were obtained from him through his ignorance, and want of counsel to advise him, and by the fraudulent and deceitful actings, doings and declarations of the said Abel and Horace and the misconduct of the said Denison.

The orator prayed that the said Abel Edgell might be decreed to execute to him a quitclaim deed of the orator's lands in Concord, and also to give up to the orator the bond executed by him to said Abel, and the agreement executed by the orator and Horace A. Edgell, and that Abel Edgell be enjoined from farther prosecuting certain suits which he had commenced at law against the orator, founded upon the said deed and bond, executed by the orator.

The defendant Abel Edgell, in his answer, admitted the execution of the agreement of May 8, 1839, between the orator and Horace A. Edgell, as set forth in the orator's bill, but averred that it was entered into at the request of the orator; he also admitted that examination of the lands in Charleston and Concord was made by

the appraisers, substantially as alleged by the orator ; also, that, af-
ter this examination, it was proposed by one of the appraisers, in
order to prevent future trouble, that the proper deeds and papers
should be executed by the parties and deposited with the apprais-
ers, as alleged in the bill, excepting that he averred that it was at
the same time, and as part of the same proposition, agreed that a
note should be executed by each party, to be also· deposited with
the appraisers, with authority for them to indorse down the note of
the party, against whom a balance should be found, to the amount
of such balance, and deliver the note, so indorsed, to the opposite
party.  He farther alleged that about this time, and before any pa-
pers were prepared, Horace A. Edgell proposed to him that he
should take his place in the said contract, and that this defendant
consented to do so, and that this was made known to the orator,
who fully assented to the change ; but that, as the whole matter was
then about being completed, it was not thought necessary to substi-
tute any new writing for that of May 8, 1839 ; and that the writings
were prepared by Isaac Denison, and executed, and left in the ap-
praisers' hands, and that the appraisal was made and declared,
showing a balance against this defendant of the sum of $366,67,
above mentioned.

This defendant farther alleged that he had no agency in deter-
mining the amount for which the said notes should be written, but
that they were prepared by the said Denison without any dictation
or suggestion on the part of this defendant, and without any intima-
tion as to what the judgment of the appraisers was to be; and he
positively denied that he had, at any period, had any collusive un-
derstanding with said Denison, or any of the other appraisers, in
reference to said appraisal, or any private interview with either
of them with a view of influencing their determination, or that he
had any intimation what their judgment was to be, until it was de-
clared to both parties, or that there was any fraud, or deception,
practised, in procuring the substitution of this defendant for Horace
A. Edgell in the performance of the contract of May 8, 1839.  He
admitted that the appraisers were not authorised, or expected, to
deliver the deeds and bonds to the respective grantees, until they
had determined the relative value of the Concord lands and the

Charleston lands, upon the basis, assumed in the contract of May 8, 1839, that said Concord lands were worth $5000; but he averred that the appraisers did make such determination, and publish the same in general terms, as above set forth.

This defendant denied that he represented his title to the "Upper Melendy Lot" to be a good title in fee simple, or that there was no dispute about it and that no one claimed it, but averred that he told the orator that he bought the lot of Silas Gaskill by a quitclaim deed, that said Gaskill had been in possession of it for a number of years, that large clearings had been made upon it, and that this defendant could only give such a conveyance as he had received,— and that the orator replied to this that he would go and examine for himself. And as to the contract of May 8, 1839, this defendant averred, that, the purpose of that paper having been carried into full effect, no formal disposition of it was considered necessary by either party, or by the appraisers, and that it was regarded as a contract fully executed and of no force and validity.

Exceptions being taken to the answer, this defendant answered farther, that he did not know that the orator read the note for $1000, which was signed by him, or that any conversation was had with him, before the signing, in reference to the amount, but that the amount was told to the orator at the time he signed it, and that he signed it deliberately; that this defendant did not know that the orator read the note and bond which he executed,—but that he believed that they were read to him before signing, and that the orator specially instructed Denison, who drew the deeds, to substitute the name of this defendant in place of that of Horace A. Edgell; that the appraisers never did make any award, or appraisal, between the orator and Horace A. Edgell,—for that, after the substitution of this defendant, no such award was expected, or authorized; that this defendant did not, at the time of executing the quitclaim deed of the "Upper Melendy lot," inform the orator that there were any adverse claimants to that lot, nor that Gaskill had been threatened with a suit, to recover from him the possession of that lot,—but that he did inform him that Gaskill told this defendant that the person of whom he bought gave only a quitclaim deed, and he was unwilling to give any other, but that he believed the title

3

to said lot was good, and that he should be willing to give a war-rantee deed thereof, were it not that it would be breaking in upon his uniform practice of giving such deeds only as he received; and this defendant denied that he had ever been informed that he had no title to that lot, and he averred that he did not tell the appraisers whether he had, or had not, a good title to said lot; and he denied that he procured Saunders to offer to the orator $300 for the lot mentioned in the bill, or that he endeavored to induce Prescott to offer him $500 for the other lot, as set forth in the bill.

The answer of Horace A. Edgell was substantially the same with that of Abel Edgell;—and, especially, he denied that he had any knowledge, at the time he executed the quitclaim deed to the ora-tor of the " School Lot," that the leasehold title to said lot had be-come forfeited by reason of the non-payment of rent which had ac-crued.

Many witnesses were examined upon each side as to the value of the Charleston and Concord lands in May, 1839, the average of whose appraisal appeared to be that the " Upper Melendy lot " was worth about $325, that all the Charleston lands were worth about $900, and that the orator's Concord lands were worth about $3000, making a difference in their relative value of over $2000, instead of $366,67 as awarded by the appraisers appointed by the agreement of May 8, 1839.   Testimony was also taken tending to show that Abel Edgell had never any title to the " Upper Melendy lot," and that the possession of that lot had, since the execution of the quit-claim deed from Abel Edgell to the orator, been recovered in an action of ejectment brought by the adverse claimants.   Testimony was also taken in reference to the unfair practices of Abel Edgell, and the proceedings and management of the appraisers, the material parts of which are sufficiently stated in the opinion of the court, and need not be detailed here.   It also appeared, that, since the appraisal, the defendant Abel Edgell had paid and become possessed of two of the notes executed by the orator to Joseph Fry upon the purchase of the Concord farm in 1835, mentioned in the bill.

The court of chancery ordered that the orator's bill be dismissed with costs; from which decree the orator appealed.

*N. Baylies* and *D. Hibbard, Jr.*, for orator.

1. By the submission the appraisers had two things pointed out for their consideration and accomplishment; the first and principal thing was to appraise the Charleston land according to the rules in the submission adopted by the parties; the second was to determine what rent the orator should pay for the use of the Concord land from the date of the submission to the first of April, 1840. The appraisers, to be governed by the submission, and to ascertain whether the price of the Concord land, $5000, was an *undervalue*, or *overvalue*, should have agreed on the value of the Concord land; they should then have agreed upon the value of the Charleston land, and have calculated what its value should be called, in order to *overvalue* it in the same proportion in which the Concord land was overvalued by calling it $5000;—that value having been fixed by the parties, the appraisers had no authority to alter it. When the appraisers had reported this their appraisal, they had done all that the submission required of them. They were not required to report the *difference;*—that the parties could ascertain for themselves. Watson on Arb. 54. Kyd on Awards 27. 17 Johns. 405. 6 Ib. 39.

Now have the appraisers done their duty? To ascertain this fact the appraisers have been interrogated upon oath. Isaac Denison says "that the appraisers never came to any agreement as to the value of any one of the five Charleston lots, nor as to the value of the whole together, that they never agreed upon any sum that the Concord lands were undervalued, or overvalued, nor as to the value of the rents and profits of the Concord land." David Moulton says "that the appraisers, before they made their award, did not agree upon any sum that said Concord lands were undervalued, or overvalued;—that the appraisers did not agree upon any sum, as the value of the five Charleston lots." It is manifest, from this evidence, that the appraisers have not appraised the Charleston lands according to the submission, and therefore their award, whatever it may be, is void. Wats. on Arb. 59. 7 East 81. 16 Ib. 57. 1 Barb. & Har. 184. 1 Saund. 33, n. 1. 1 Swift 468.

2. The award of the appraisers has no submission of the parties to support it, and was not called for.

3. The award was not made between the parties to the submission. Kyd on Awards 42. Caldwell 99. Watson 55.

4. The award should be set aside, because it was obtained by the irregularity, corruption, or partiality, of Isaac Denison, one of the appraisers, and by the fraud of Abel Edgell, who acted as agent of Horace A. Edgell, one of the parties to the submission.

Abel Edgell wrongfully obtained possession of Howard's deed on the 21st day of May, 1839, and soon after Howard had placed said deed in the hands of Denison as an *escrow*, and before the appraisers had made their award, and caused the said deed to be recorded in the town clerk's office in Concord. That deed having been placed in the hands of the appraisers merely as an *escrow*, to await the making of the appraisal, and no appraisal having ever been made in pursuance of the submission, the appraisers had no authority to make a valid delivery of that deed, or of the bond ; and the same are void for want of a delivery. 2. Bl. Com. 306–7. 4 Cranch 219. 2 Johns. 248. 11 Vt. 447.

It appears from the testimony that the Charleston lands, in May, 1839, were worth $890 ; this sum, added to Abel Edgell's note of $366,67, make the sum of $1256,67. This sum is *all the consideration* which Edgell pretends he has made Howard for his Concord land, appraised by the witnesses at $3016. The difference between the *consideration* and the value of the Concord land is $1759,33. One half of the appraised value of the Concord land is $1508, which is $251,33 more than is paid for the whole of the Concord land. The civil law pronounced the sale of lands, for less than one half of their value, to be void for inadequacy of consideration ; 1 Story's Eq. 250 ; but this rule is not the law of this court. An able writer on the law of this court says, "Though the inadequacy of price, when standing by itself, be not sufficient to induce a court of equity to set aside an agreement, yet, when connected with other circumstances, it may tend materially to assist the plaintiff in making a case of fraud. And even when standing *alone*, if the inadequacy of the consideration be so strong, gross, and manifest, that it must be impossible to state it to a man of common sense without an exclamation at the inequality of it, a court of equity will consid-

er it a sufficient proof of fraud to set aside the purchase.   For there is a difference between *inadequacy,* and *evidence* arising from inadequacy;" Newland on Cont. 358.   And see 2 Swift 47; 1 Barb. & Har. 152; 14 Ves. 214; 10 Cond. Eng. Ch. Rep. 406; 2 Sch. & Lef. 488, 492.   1 Aik. 390.

The evidence tends  strongly to show partiality, or corruption, in Isaac Denison, one of the appraisers.   If this be so, the award should be set aside.   Wats. on Arb. 88–90.   Kyd on Awards 358. 17 Johns. 405.   1 Barb. & Har. 565,647–8.   1 Swift 472.

The fraud of Abel Edgell,—who acted as agent for Horace A. Edgell, and for whose doings Horace is responsible,—in concealing from the orator the fact,—known to himself,—that there were adverse claimants to the "Upper Melendy lot," and that his title thereto was disputable, vitiates the whole contract.   Wats. on Arb. 91. 2 Swift 41.   1 Barb. & Har. 147, 149.   1 P. Wms. 239.   Lawrence, one of the appraisers, and a witness, says, "that, if he had known before the appraisal that there were adverse claimants to that lot, or that Abel Edgell had no title to it, he would not have consented to the making said award."   This declaration, by one of the appraisers, is sufficient cause for setting aside the award.   Kyd on Awards 354.   Caldwell 66, 67.   Wats. on Arb. 91.   When parties are making a contract, as between each other, it is a rule that a party may bind himself by a representation, as much as by an express covenant.   2 Sw. Dig. 41.   9 Ves. 21.   1 Ves. & B. 355.   The words used in the contract of May 8, 1839, " *it being all the land which the said Edgell owns in said town,*" refer back to, and *represent,* that said Edgell was the *owner* of the five farms previously mentioned in the same agreement.

The agreement of May 8, 1839, contained a provision that Horace A. Edgell should pay to the orator, on demand, whatever difference might be found between the lands.   This covenant was sufficient, and much better for Howard than Abel Edgell's note of $1000 to secure the payment of $3000.   It is incredible that Howard should accept this note in lieu of the covenant.   If he did, it proves that he was not capable of transacting his business.   Although Abel Edgell swears that the giving of these notes was mentioned, as a part of the " proposition " assented to by the parties

before the writings were made, yet Horace A. Edgell, who had an equal opportunity of knowing the truth, does not, in detailing in his answer the terms of that " proposition," mention the giving of the notes, and the testimony shows that it was not then spoken of. The truth is, these two notes were got into the case by the fraud and corruption of Abel Edgell and Denison.

At the time the deed and bond were executed by the orator, the equitable title to the Concord lands was in Horace A. Edgell by virtue of the contract of May 8, 1839 ; Abel Edgell had no legal or equitable title thereto, and the orator could not deed to him without violating his covenant to Horace. To suppose, then, that the orator would give his deed to Abel, without being discharged from his covenant to Horace, is either to suppose that he was *non compos mentis*, or that the deed and bond were obtained of him through *fraud, accident*, or *mistake*. It seems that he did thus execute the papers ; but Abel Edgell should not be profited by this mistake, for he contributed largely to produce it. 2 Sw. Dig. 46. 1 Barb. &. Har. 401, 563. 2 Sch. & Lef. 474, 492. 9 Cond. Ch. R. 415. 10 Ib. 406. 1 Russ. 485. 1 P. Wms. 239. And the evidence is wholly insufficient to prove the *arrangement*, pretended to have been made between Horace and his father, in reference to the substitution of the latter in place of Horace. But if any such arrangement ever was made, it was a *parol agreement*, merely, between Horace and his father, and was within the statute of frauds ; for Horace was, in equity, the owner of the Concord lands, and could only convey his interest by writing. Sl. St. 166, §§ 2, 3. 2 Johns. 430. 15 Ib. 200, 502.

Isaac Denison, in writing the deed which was executed by the orator, inserted the sum of $4500 as the consideration,—which was more than three times the actual consideration received. " The consideration of a deed may be such, as to show of itself that it was fraudulently obtained." 2 Sw. Dig. 46. 10 Cond. Ch. R. 406.

*C. Davis* for defendants.

The orator, in praying for the interference of this court, in setting aside and annulling a solemn and deliberate contract, between parties competent to contract, must do something more than show

some little inequality in the contract,—which in truth exists in a greater or less degree in nearly all cases,—something more than ignorance in himself, or the appraisers, of some fact, or circumstance, which, if known, might have slightly varied the sum to be paid, something more than vague suspicions of conspiracy, if, perchance, one of the appraisers should be seen in conversation with the opposite party, something more, in short, than the failure on the part of the appraisers to adopt a rule of construction of the preliminary contract, which would have enabled the orator to perpetrate a meditated fraud upon the defendant, instead of one which obviously carried into effect the intentions of the parties, supposing such intentions to have been honest. There must, in general, be positive fraud, or constructive fraud, and this not merely suspected, but proved. 2 Story's Eq. 5, 6. 1 Ib. § 190. *Trenchard v. Warley,* 2 P. Wms. 166. 1 Fonbl. Eq., c. 2, § 8, note.

The appraisers were not arbitrators, but appraisers merely,— the sole matter submitted to them being to determine the value of the Charleston lands, in reference to a standard of value arbitrarily assumed by the parties as applicable to Howard's Concord lands, and to find the *real difference* in value, taking into consideration that Howard was to retain the occupancy of the Concord lands for nearly a year. So far as the sealed contract is concerned, no other matter was submitted to their judgment. Every thing else was to. be matter of contract between the parties, either verbal, or written.

Circumstances which might induce a court of equity, in the exercise of a sound discretion, to refrain from aiding a party in carrying into effect a contract, will often be insufficient to procure a rescinding of that contract. 1 Fonb. Eq., c. 3, § 9, note (*i.*) 2 Story's Eq., §§ 693, 676, 770.

The first objection is, alleged misrepresentation by both of the defendants, during the verbal negotiations which preceded the execution of the contract of May 8, 1839, in reference to the title of Abel Edgell to the "Upper Melendy lot." We contend that such representations, even if they were made, would constitute no valid ground of relief, because the preliminary contract was afterwards reduced to writing, and was signed by the parties, and contained an express provision that that lot should be conveyed by a quitclaim

deed only, without covenant of title. 1 Story's Eq. 168–173. 1 Fonbl. Eq., c. 3, § 11, note (*o.*) 1 Johns. Ch. R. 429. But it is not pretended that any error existed with respect to the title to the lot in question, either in the preliminary contract of May 8, 1839, or the final contract of May 21, 1839. *Hunt* v. *Rousmaniere,* 1 Pet. R. 1. In both it was clearly and distinctly understood that Abel Edgell would simply relinquish to Howard whatever title he had to the lot, together with the actual possession, without any guaranty as to the validity of that title.

Both Abel Edgell and Horace A. Edgell positively deny having represented Abel's title to said lot to have been valid beyond a doubt; and there is no testimony in the case to contradict this. Failing in this, the solicitors for the orator have endeavored to create a false issue; they are compelled to assume, that, if Abel had received any information tending to cast doubt upon his title, and did not communicate it to Howard, it would amount to a fraud and entitle the latter to a rescinding of the contract. This proposition cannot be maintained for a moment. The whole current of authorities is against it. Judge Story declares, that, however questionable the contrary doctrine may be in point of morals, it is too firmly established to be open to controversy. 1 Story's Eq., 216, 221. *Fox* v. *Mackreth,* 2 Bro. Ch. R. 420. It is always in the power of the purchaser to require a guaranty of the title, if he choose; if he waive this, and accept a mere acquittance of the grantor's right, he cannot complain, if it turn out that he acquired no valid title, though he parted with a valuable consideration therefor.

But we regard the evidence of want of title in Abel Edgell as incompetent and inconclusive; the most this court will do is to say that the title was doubtful,—1 Fonbl. Eq., c. 5, § 8, notes; *Prentiss* v. *Larnard et al.,* 11 Vt. 135,—which we admit, and which Abel expressly stated to Howard, in the course of the negotiation, was the fact. But, even if the title to one lot failed, it by no means follows that the orator can insist upon having the whole contract set aside. 15 Serg. & Rawle 45. 5 Bin. 362, 368. 3 Yates 6. 1 Fonbl. Eq. 372, note.

Another objection is, that no preliminary contract was entered into between Abel Edgell and Howard. But this position is met by

Howard *v.* Edgell et al.

a mass of testimony, both direct and circumstantial, perfectly conclusive.

After the explicit declarations of Horace A. Edgell that he considered the contract of May 8, 1839, as cancelled, or superseded, by the subsequent arrangement, we think Howard may safely dismiss his simulated fears that this contract may some day disturb him.

It is insisted that the appraisers did not proceed in the *manner* indicated in the contract of May 8, 1839. They supposed their only business was to find the honest difference in the value of the estates to be exchanged. If they had supposed the instrument had been formed in a manner to enable one party to perpetrate a gross fraud upon the other by a *catching bargain*, they would never have consented to have been made the instruments of effecting so dishonorable a purpose. We now understand the burthen of Howard's complaint to be, that the appraisers so construed their instructions, that he failed in accomplishing the fraud he meditated. It now appears by the testimony of Dr. Chamberlain, which could not have been suspected by the appraisers, that Howard intended, by the peculiar mode in which this part of the contract was moulded, to obtain an unfair advantage in the appraisal. Let us see how this cunning scheme would have operated, if permitted to have been carried out as designed. Suppose Howard's lands, estimated at $5000, were estimated 100 *per cent.* too high,—thus making their real value $2500; suppose the five lots in Charleston, adding the year's rent, were really worth $1300; add 100 *per cent.* and it would bring them up to $2600,—which, taken from $5000, leaves a difference of $2400. But the *real difference* in the value of the two would be only $1200; and yet, by the mode of appraisal insisted on, if carried out, this difference is swelled to *double* that sum. Such is an exemplification of this beautiful plot for cheating according to rule, which a court of chancery is asked to sanction.

The arrangement in reference to the notes and deeds seems so perfectly natural and unexceptionable, that one would scarcely expect it to excite particular attention; notwithstanding the attacks upon it, it is a point entirely impregnable.

It is now well settled that mere inadequacy of price, however great, affords no ground for relief; it is merely a matter open to

Howard *v.* Edgell et al.

comment, and may constitute one among a thousand circumstances, from which fraud may be inferred. 1 Story's Eq. 241. 1 Fonbl. Eq., c. 2, § 9, note (*d.*) In this case the discrepancy is far from being what it is represented to be on the other side, and is far from coming up to the civil law rule, and cannot, therefore, be regarded as a substantive ground for interference.

The orator's bill abounds in charges and insinuations of improper influence exerted by Abel Edgell over one of the appraisers, and the imagination of the orator, or of his solicitor, seems to have been taxed to the utmost to find, or invent, circumstances light as air, and convert them into proofs of fraud. It would certainly be tedious to undertake to notice in detail these endless accusations, unsupported as they are, for the most part, by any reliable evidence, and frivolous as they would be, if proved.

The opinion of the court was delivered by

BENNETT, J. This case comes before us by appeal from the decree of the chancellor of the fourth judicial circuit. The object of the bill is to relieve the orator from the effects of his contract, and the *grounds* of this application, are fully set forth in his bill. The case is important to the parties; and the counsel are entitled to much credit for their industry, and the ability displayed in the argument.

To carry into effect the exchange of the lands, contemplated by the parties, an agreement, under seal, was entered into between the orator and Horace A. Edgell on the 8th of May, 1839, by which they were to have the Charleston lands appraised. By this agreement the value of the orator's lands was fixed at *five thousand dollars.* The appraisers were to appraise the Charleston lands in the *same proportion* in reference to their *actual value,* taking into consideration the fact that the orator was to have the use of both the Concord and Charleston lands until the ensuing April. In regard to the actual value of these lands; there is, as is common in such cases, considerable diversity of opinion. Taking the average estimate of some twenty two witnesses, examined on the one side and the other, we find that the orator's lands in Concord are estimated at about the sum of three thousand dollars. The average result of

the estimate of the witnesses examined, (some seven or eight,) as to the value of the five several lots in Charleston, places them at about the sum of nine hundred dollars, though falling below. The sum awarded by the appraisers to be paid to the orator, upon the exchange of these lands, was three hundred sixty six dollars and sixty seven cents. The result is readily seen.

Though the contract of the 8th of May was made by the orator with Horace A. Edgell, preparatory to the exchange of these lands, yet it is claimed by the defendants, that, after there had been an examination of the Charleston lands by the appraisers, and while they were assembled at Concord to examine the orator's lands, and before any definite action had been had by the appraisers; there was a verbal agreement between the orator and the Edgells, that Abel Edgell should take the place of his son in the contract, and that things should proceed from that time, in carrying out the contract, the same as if Abel had been a party to it from the beginning, instead of his son. For the purposes of this case, we are disposed to consider such *parol* agreement as proved by the evidence, and to regard it as binding upon the parties; though we do not find it necessary to form, and much less to express, any definite opinion upon the point. We shall then proceed upon the assumed ground, that no objection can be made, because subsequent proceedings were had, and the award made, as between the orator and Abel Edgell. We are called upon to set aside this exchange of property, and to restore the parties to their original condition, as far as practicable.

The important inquiry is, *shall this be done?* It is not uncommon for a court of chancery to refuse to lend its aid to enforce a contract by reason of inadequacy in the consideration; but it is well settled that *mere inadequacy*, independant of and unconnected with other circumstances, is not sufficient, *per se*, to rescind a contract, unless its grossness amount to fraud. In the one case it is of itself sufficient; in the other it is to be considered with reference to the evidence, which is to be derived from it. There is no certain rule as to the degree of grossness, necessary to furnish in itself evidence of fraud. Lord Thurlow, in *Gwynne* v. *Heaton*, 1 Brown's Ch. R. 9, says, "it must be an inequality, *so strong, gross and manifest*, that it

must be *impossible to state it* to a man of common sense, *without producing an exclamation at the inequality of it.*" This, in substance, is the rule, as laid down by other chancellors ; and is, at best, loose and unsatisfactory, but too firmly established to be altered without changing the rules of property. Equity, which requires *equality*, should preside in all agreements. This is required by the pure morality of the gospel. Inadequacy in consideration renders the contract inequitable, and the principle of moral duty imposes the obligation of supplying the deficiency. In the case before us the difference is more than *two to one;* under the *civil law*, if, in the sales of immoveable property, the *inadequacy* of price was equal to half the value, the contract was, on that account, held vicious. Though the common law has not adopted this rule, still it has adopted rules, which, as applied to the evidence in this case, require this contract to be rescinded. The evidence presents other ingredients, to say the least, of a *suspicious nature*, which, connecting themselves with the *gross inadequacy of price*, materially assist the orator in making out a case.

The deed of the orator of his farm to Abel Edgell and the other deeds and writings were made out the day before the award of the appraisers was made, and placed in the hands of Isaac Denison, one of the appraisers, and not to be delivered over by him to the persons to whom they should belong, until the appraisers had determined the *relative* value of the lands upon the principles of the written submission, executed by the orator and Horace A. Edgell. This fact is established most fully by the answer of Abel Edgell, and by the other testimony. A standard value of *five thousand dollars* had been put upon the orator's lands by the agreement of the parties ; and it was made the business of the appraisers to appraise the Charleston lands in the same proportion in respect to their relative and true value, taking at the same time into consideration the use which was to be reserved to the orator in the lands. Lawrence and Moulton, two of the appraisers, testify that they paid no attention to the valuation of the Concord lands, as fixed in the agreement, but appraised all the lands at such sum as they supposed to be their actual value. We find that the appraisers eventually fixed upon the

ultimate difference, which should be paid by Edgell upon the. exchange, as the average of the difference of each man's appraisal, upon the principles by which he was governed.

It is admitted by the counsel for the defendants, that, unless there has been an appraisal according to the spirit of the requirements of the written agreement, there was no authority vested in Denison to deliver over the deeds, which he held as *escrows,* and that they must fail for want of a legal delivery. It is, however, assumed by counsel, that the views of Moulton, as to the spirit of the contract, were correct, and the principles, upon which he and Lawrence proceeded in appraising the property, necessary, in order to prevent the advantages of a *catching bargain.* If we grant this position, it follows that the three appraisers should have come to a result by adopting the same principles. Denison, however, says he took Howard's lands at the assumed value of *five thousand dollars,* and appraised the Charleston lands in the *same proportion,* and thus obtained his result. Consequently, as the final result was obtained from the individual result of each appraiser, the *relative value* of the lands has never been determined, either upon the one principle, or the other. It is, however, very clear that the written submission required the appraisers to value the Charleston lands according to a given standard, and thus furnish premises for a result, not showing the *actual,* but a *hypothetical* difference in the lands.

It is said that this gives the orator an unconscionable advantage in the appraisal. It may be so, but what then? It does not follow that the court can make a different submission for the parties, nor that they would aid the orator in carrying into effect, or retaining, an exchange predicated upon such an appraisal. All the powers of arbitrators are derived from the submission of the parties; and so it must be with these appraisers. 17 Johns. 405. The result must be, that, the appraisers not having kept *within* their powers, their award, upon which the exchange is predicated, is void.

It cannot be disguised, that the proceedings in this case present some, at least, of the appraisers in an unfavorable light. It is quite remarkable that both Moulton and Denison should have adjudged the difference, which Edgell should pay upon the exchange, only *fifty dollars,* when an average of a large mass of testimony be-

fore us shows the actual difference in the value of the lands to be more than *two thousand dollars ;* and especially when Denison tells us that he took, as his basis, the Concord lands at their assumed value. This tends strongly to show *gross partiality*. We have also the testimony of George W. Denison, that Isaac Denison told him that Edgell was getting "*an all-fired great trade out of Howard;* and that Howard was very much worried about it." This conversation Mr. Denison thinks took place at Burke, when the appraisers were on their way from Charleston to Concord ; and, in the same conversation, he testifies that Isaac Denison said he had got to go down to Concord and make the writings, as Edgell would have no one else do it. Isaac Denison, however, in his testimony, says he has no recollection of ever having any conversation with G. W. Denison, or any one else, upon the subject of his making the writings, before he went from Burke to Concord ; and says he did not tell G. W. Denison, or any one else, soon after his return from Concord to Burke, that Abel Edgell *had cheated* Howard, nor any thing of the kind ; but he does state that after the appraisers had been at Charleston, and before they went to Concord, he told G. W. Denison that Edgell was making " a *great trade* " with Howard, and that he was surprised they should leave it to men. But whether he got " *a great trade*," if by this was meant an unequal bargain, must depend upon the result of the appraisal ; and we find this same Mr. Denison fixing the boot money at *fifty dollars*. It is urged by the defendants, that most probably G. W. Denison must be mistaken as to the time of the conversation with Isaac Denison ; and that it was after the return of the appraisers from Concord. This might seem probable ; but if so, it would not help the case. If Denison made the expression, imputed to him by G. W. Denison, after the appraisal was completed, it shows that he did not act his judgment in making it.

It appears that the deed from Howard to Edgell, of his farm, was put on record the 21st of May. If there is no mistake in the date of this record, it must have been done before the award was made. All agree that the award was made on the 22d of May. Denison says he delivered over this deed, after the award was made, with the other deeds and writings. It is most probable there was a mis-

take in the Town Clerk, in the day of the month on which it was filed for record. In the testimony of E. D. Goodwin it appears, that, in conversation upon the subject of the trade with Mr. Gilkey, Abel Edgell said, he and Denison were old settlers together, that there had always been a good understanding between them, and that he was not afraid to submit the case to him. All that can be said of this is, that it goes to show a personal friendship, and, in connection with other testimony, may tend to establish an improper partiality.

In regard to the "Upper Melendy lot," one of the five Charleston lots, it is quite clear that Abel Edgell had no title to it. The title was in the heirs of Asa Mathewson, and his administrator, at the Orleans County Court, December term, 1839, recovered the possession of it. Silas Gaskill testifies, that, in 1838, when he bargained with Edgell for this and other lots, he told him he could only give him a quitclaim deed of this lot,—that it was all he had of it,—and that there were *adverse claimants* to it, &c. Brigham Pike states, that, in the spring of 1838, he examined the title of Silas Gaskill to this lot, found it disputable and doubtful; and that, upon being enquired of by Abel Edgell, why he did not buy it of Gaskill, he assigned to him *this*, as the reason. He also says, that this conversation with Edgell was while he lived at Concord, and before he removed to Derby in April, 1839. Edgell, it is true, in his answer, denies that he was informed by Gaskill that there were adverse claimants to this lot at any time, before he gave his quitclaim deed to Howard; and also denies that he was informed by Pike that the title of Gaskill was doubtful *within the time specified.* It is consistent with the answer that he was subsequently informed of it. The fact that Gaskill had no title was readily discoverable upon an examination of the records in the Town Clerk's office; and we think, in view of the evidence and the nature of the case, that Edgell is chargeable with notice, before his deed to Howard, that Gaskill's title, and of course his own, was invalid.

The purchase of this lot, though Howard, by the contract of the 8th of May, was to have but a quitclaim deed, was not a bargain of hazard as to title. He was to pay its full value; and had the right to expect an equivalent. Abel Edgell, in his answer, says that

Gaskill told him, that the person of whom he bought gave only a quitclaim deed, and that he was not willing to give any other, but that *he believed the title good,* and that he should be willing to give a warrantee deed, were it not that it would break in upon his uniform practice of giving such deeds only as he received.  He says he informed Howard of whom he bought the lot, of the kind of deed he had taken, and the substance of what Gaskill had told him, and that he himself did not know whether the title was good or not. Howard, then, was assured that Gaskill believed the title good, and that it was not on account of any doubts as to title, that he could only give a quitclaim deed; and that Edgell himself did not know about the title.  Whereas, Gaskill says he told Edgell there were adverse claimants, of the name of Mathewson, as he was informed when he bought,—that he had been threatened with a suit, though none had been commmenced, and he did not believe any suit would be commenced.  This information he says he gave Edgell, at the time he traded with him, and he thinks, also, the substance of it about a year before that time.  Edgell not only *suppressed* the information, which we think he had as to the defect of his title; but, in representing that Gaskill thought his title good, and that he had no objection to giving a warrantee deed but his practice did that, which was calculated to quiet any examination as to the title on the part of Howard.  That Howard supposed he was to get a title to this lot no one can doubt.  The average value of the lot, by the witnesses examined, is about three hundred and twenty dollars. With a deduction of this lot, it would leave the value of the Charleston lands, received by Howard on the exchange, less than six hundred dollars.

If Prescott's evidence, in regard to his being solicited to make Edgell an offer for the Gilman lot, and that of Saunders, in regard to the offer which he says he made for the Allen lot, can be relied upon, they do furnish evidence of a device on the part of Edgell to obtain an *over appraisal* of the Charleston lands.  These witnesses, however, are opposed by the answer of Edgell; and it may be difficult to determine how the facts in this particular were.

In the case of *Brown* v. *Sawyer,* 1 Aik., 130, the rule is laid down, that gross inadequacy of price is evidence from which a jury.

may presume *fraud*, or mistake, if there be no circumstances in the case, which rebut the presumption. Though it should be held, that *mere inadequacy* of price will not of itself substantiate a charge of *fraud*, yet, when gross, and connected with other *circumstances of suspicion*, (as in the case of weakness of intellect, not amounting to insanity,) it may furnish satisfactory ground for relief, especially in a court of equity. When we take into consideration the gross inadequacy of price, the fact that no award of the appraisers was ever made upon the principles contained in the contract of submission, and the many ingredients, to say the least, of a suspicious nature attending the case, we have no doubt that the orator, Howard, should have relief.

This Court, then, advise that the decree of the Chancellor be reversed, that the deed of the orator of the 21st of May, 1839, of his Concord farm, to Abel Edgell, be held *null* and *void* to every intent and purpose; and that Edgell, and all persons claiming under him, be perpetually enjoined from setting up any title to said premises, and every part thereof, under said deed, both at law and in equity; and that they and each of them be restrained from using said deed as evidence in a court of law, or equity; that the bond of the orator to said Abel, under date of 21st of May, 1839, specified in the bill, be delivered up by said Abel to the orator to be cancelled; and that the said Abel be perpetually enjoined from having and maintaining any action, or actions, on any of the covenants in said deed, or upon said bond, or for the seizin and possession of the lands specified therein; and that the defendants pay to the orator, by a time to be fixed by the Chancellor, the costs in the Court of Chancery, and also the costs in this Court.

It is farther *advised* that the two deeds from Horace A. Edgell to the orator, and the three deeds from Abel Edgell to him, specified in the bill, of the Charleston land, be held void, and of none effect to pass the title to said lands, or to give an action on the covenants therein contained, and that the note of one thousand dollars of the said Abel to the orator, endorsed down to $366,67, be held null and void and of none effect. Provided, however, the decree is to be of no effect, unless the orator shall pay to the clerk of the Court, for

the use of the said Abel Edgell, by a time hereafter to be fixed by the Chancellor, such sum as the said Abel paid on the orator's notes to Joseph Fry, and the interest on the same, the amount of which is to be ascertained by the Chancellor, and this cause is remitted to the Court of Chancery, that it may be proceeded with accordingly.