## POPE MANUF'G CO. *v.* GORMULLY. (No. 824.)

*(Circuit Court, N. D. Illinois.* April 30, 1888.)

PATENTS FOR INVENTIONS — LICENSE — UNCONSCIONABLE COVENANTS — SPECIFIC PERFORMANCE.

P., the owner of some 65 patents for improvements in bicycles and tricycles, and engaged in the manufacture of machines covered by those patents, granted a license in June, 1883, to G., who was a similar manufacturer and owned somewhat similar patents. This license covered only two of P.'s patents, and the machines made under them were of an inferior character. By its terms, this license was to expire, as to one patent, in nine months, and as to the other at any time upon written notice from G.; and nothing was expressed or implied as to any other of P.'s patents. G., desiring to make more perfect machines, applied to P. for licenses under some of his other patents. Correspondence passed between the parties, from which it appeared that G.'s only object was to have the terms of his existing licenses widened so as to take in his contemplated improvements. The contract in suit was finally executed in December, 1884, G. signing it without referring it to a lawyer. Under this contract, which was drawn with much artificiality, G. was granted licenses under 15 out of the 65 patents of P. until April, 1886, and, in consideration thereof, he was made to recognize and admit the validity of all, and P.'s title to the same, and also to covenant not to manufacture or sell any machines covered by any of the patents after his license ran out or was surrendered, and even after the expiration of all the patents covered by his license. After the license had terminated, P. filed a bill for injunction and account, alleging infringement. *Held,* that the bill amounted to one for specific performance, and that, under the circumstances, it should be dismissed, the contract being unconscionable, and, in a measure, against public policy.

In Equity. Bill for injunction and account.
Before GRESHAM, Circuit Judge, and BLODGETT, District Judge.
*Coburn & Thacher,* for complainant.
*B. F. Thurston* and *Offield & Towle,* for respondent.

BLODGETT, J. This is a bill in equity whereby the complainant seeks a decree enjoining the defendant from the manufacture and sale of bicycles and tricycles containing certain devices, and for an accounting. The bill charges that complainant on the 1st day of December, 1884, and for a long time prior thereto, was engaged in the manufacture and sale of bicycles, tricycles, and other velocipedes of superior quality, grade, construction, and finish, and was the owner of a large number of patents, the features of which were embodied in the construction of such vehicles; that on the 1st day of December, 1884, complainant entered into a contract with the defendant, whereby there was granted to the defendant the right to make, use, and sell, for a certain term therein mentioned, bicycles of 52-inch size, and upwards, of certain grades, style, and finish, and to be sold at a certain price limited by said contract, and embody-

ing the inventions set forth in certain letters patent, mentioned in the contract, and none other; and also containing the further agreement on the part of the defendant that he would not manufacture, sell, or deal in bicycles, tricycles, or velocipedes containing certain features or devices covered by certain other patents which were specifically enumerated in said contract; and charging that the defendant, in violation of the last-mentioned clause and provisions, has manufactured bicycles and tricycles containing the devices which he had so agreed and stipulated not to use; and praying that the defendant be enjoined from the use of said devices, and for an accounting.

There is no contest between the parties as to the execution of the instrument set out in the bill; and the only question made by the defendant is as to whether the complainant under the contract is entitled to the relief asked for, or any relief, from a court of equity. The contract in question recites in the opening paragraph that complainant is the owner of certain patents, amounting to 65 in all, giving the number and date of said patents, and the names of the patentees respectively; and by the first article of the contract the defendant is licensed to manufacture in the city of Chicago bicycles of 52-inch size and upwards, embodying the inventions set forth in 15 of the patents enumerated in the opening paragraph or preamble, and no others; and in the ninth article, the defendant agrees that he will not import, manufacture, or sell, either directly or indirectly, any bicycle, tricycle, or other velocipede, or the pedals, saddles, bearings, rims, or other patented parts, or devices containing any of the inventions claimed in either of said recited letters patent; nor make, use, or sell such vehicles containing any of the devices or inventions covered by any of the patents recited in the preamble of the contract, other than those which were specifically mentioned in the licensing clause; nor, in any way, either directly or indirectly, dispute or contest the validity of said letters patent, or either of them, or the title of the complainant thereto. The eleventh clause of the contract gave to the complainant the right to cancel and terminate the license on the occurrence of certain conditions; and also contained a clause allowing the defendant to surrender the license contained in said contract at any time by written notice to that effect, and returning said contract to the complainant. It was, however, expressly provided that no such revocation or surrender, and no termination of said contract, or any part of it, should release or discharge the defendant from the obligations, admissions, and agreements, contained in the sixth, seventh, eighth, ninth, and eleventh articles of said contract, which it is recited were a part of the consideration for the granting of the license contained in said contract, and are irrevocable except by the written consent of the party of the first part. It was further agreed that if the defendant should continue after the termination of such license to make, sell, or use any machine, or substantial part thereof, containing either of the parts specifically referred to in the ninth article, or any invention in any form set forth and claimed in any of the letters patent recited, the complainant should have its remedy for a breach of said contract, or the defendant might be liable to the complainant as an infringer

of such patents. The proof also shows that the complainant on June 13, 1883, granted to the defendant two other licenses giving him the right to use certain of the patents recited in the preamble to the contract of December, 1884. These two last-mentioned contracts are not counted upon or referred to in the bill, and only become material when considering complainant's right to a remedy against the defendant under this bill; but as the complainant has put these two earlier contracts into the record, they may be properly considered for the purpose of construing and determining the rights of the parties in this case under the first-mentioned contract. It will be seen from this outline of the terms and scope of this contract that the complainant, while licensing the defendant to use some 15 of the 65 patents enumerated in the preamble of the contract, and none other, has, in terms or words, obtained a covenant from the defendant admitting the validity of, and complainant's title to, a large number of other patents owned by complainants, and a covenant not to manufacture, use, or deal in the devices, or any of them, covered by any of the claims of this long list of patents recited in the preamble, and has also perpetuated these admissions and these covenants so that they shall bind the defendant after the license is terminated and surrendered, and even after the expiration of all the patents which the defendant was specifically licensed to use.

It is contended on the part of the defendant that this contract was entered into with the express understanding on his part that it was not to continue later than the 1st day of April, 1886, by which time all the patents enumerated in the licensing clause of the contract, which the defendant used in the manufacture of his bicycles, would have expired; and that the defendant, by inadvertence and mistake, and without knowing the full import of articles 9 and 11, and without knowing that by the terms employed in said articles the obligations of the contract were perpetuated as to all the complainant's patents, executed said contract upon the understanding and with the belief that, whenever the licensing portion of said contract was at an end, he was relieved from all the obligations contained in the contract. In other words, the position of the defendant is that, as he understood the contract at the time he executed it, none of its provisions bound him beyond the time when the contract should be terminated by either party. It will be seen from the statement that this contract develops an attempt on the part of the complainant to bind the defendant not to use any of the devices covered by the complainant's patents, although said patents were not the subject-matter of complainant's license to defendant, and to bind the defendant with specific admissions of the validity of all of said patents, and each and every claim thereof, and of the complainant's title thereto; and in case the defendant should use any mechanism covered or claimed to be covered by a claim in any of these patents, to give the complainant a summary remedy against the defendant by estopping him from denying the validity of the patents, and compelling him to answer in damages for such use. As has been already said, the proof shows that the defendant held two licenses granted by the complainant on the 13th of June, 1883, allow-

ing him to manufacture and sell velocipedes, bicycles, and tricycles under certain enumerated patents, and these two contracts or licenses contain no provisions with reference to any patents owned by the complainant other than those specially enumerated in the licensing clause, and contain no clause or provision perpetuating the obligations of the contract beyond the term of the license. One of these earlier licenses was by its express terms to continue only for a term of nine months from the date thereof; and the other allowed the defendant to surrender it at any time by written notice to that effect, and the return of the agreement to the complainant. These two licenses of June, 1883, restricted the defendant to comparatively small and cheaply constructed bicycles and tricycles; but it would seem from the proof that there had been negotiations between the parties for the privilege, on the part of the defendant, of constructing a larger and better class of such vehicles; and in the spring of 1884 some correspondence commenced between the parties as to the terms upon which the complainant would allow the defendant to manufacture these larger and more expensive vehicles; and some time in October, 1884, the complainant prepared a contract and sent it to defendant for signature. This contract so sent to the defendant provided that it would remain in force until November 21, 1894. The defendant had always contended that he did not use any of the complainant's patents whose life extended beyond April 1, 1886; and it also appears from the proof that the defendant was himself the owner, licensee, or assignee of a large number of patents for devices which went into the construction of the machines manufactured by himself; and that, on an examination of the draft of the contract so sent him by the complainant, he objected that the complainant could render him no protection after the expiration of the patents which he used, which would be in the spring of 1886, and suggested that the whole matter of the permission which he had asked to manufacture the larger and more expensive vehicles could be accomplished by simply indorsing this permission on the licenses which which he then had; and complained that the contract tendered him by the complainant would cripple him for the term of 10 years, or until November 21, 1894. The complainant thereupon replied to this objection, under date October 20, 1884, in the following language:

"We suppose your objection to the ten-years matter arises from the words used at the end of the fifth line on the second page,—'the 21st day of November, A. D. 1894,'—which, if objectionable to you, you may erase, and interline in place of that, 'the 1st day of April, A. D. 1886,' and that will relieve this objection. You should not be so much afraid of our wishing or trying to cripple you, and leave the rest of the world free. Some day you will get this idea out of your mind. With the change in the license above noted, that is the way we are willing to give it, and if there is unnecessary verbiage, let it go as our fault."

Under date October 29, 1884, the defendant also wrote the complainant, and objected to the contract because it included what is known as the "Peters Patent," No. 197,289, claimed to cover ball-bearings, on the ground that he, defendant, had a patent for a globular bearing which he

was then using on his machine; and to this complainant replied under date November 4, 1884: "You misread the license, probably as to the Peters patent, as we do not ask you to admit in the license that the ball-bearings on the 'Ideal' infringe that patent. \* \* \* We would not ask you to relinquish any claim which you have in any patent." And on the 12th of November defendant wrote to complainant in reference to the contract in question: "This license is to terminate, if I wish so, on the 1st of March, 1886, or sooner."

When we take into consideration the fact that the defendant's prior licenses from the complainant contained no clause committing or binding him to any admission as to the validity of any of complainant's patents which he was not licensed to use, and which had no clause perpetuating or continuing any obligation on the part of the defendant not to use any of the complainant's patents, or admitting their validity; and also when we consider the fact that the defendant was himself the owner of a large number of patents used in the construction of machines which he was manufacturing, and that he only considered the patents specially covered by the license clause of this contract as in any way useful to him in the manufacture of his machines; and that the complainant had allowed him, without question or challenge, to manufacture bicycles with ball-bearings, hammock-saddles, bifurcated backbones, and rubber handles; in fact, containing all the special features covered by other patents also held by the complainant; and consider the manner in which the defendant insists that he does not wish a license to extend beyond the life of the patents which he was then using,—we think there can be no doubt that the defendant, at the time he executed this instrument, supposed in good faith that when the license terminated, either on the 1st day of April, 1886, or earlier, as it might by the action of either party, all the obligations it contained were also at an end, and, doubtless, the defendant executed this instrument upon that supposition, and had no thought that he was binding himself for all time, or at least for the lifetime of all the complainant's patents, to an admission of their validity, and every claim thereof, and of the complainant's title thereto, with a covenant that he would not use the devices which were covered or included in any of those claims; in other words, that he was giving away his own patents, covering some of the same devices, and admitting that the Peters patent, for instance, which was not a patent for ball-bearings, but, at most, only a patent for adjustable roller-bearings, was valid, and prevented the use by him of his own patent for globular bearings. The defendant did not apply for or ask any new license from the complainant, but only for the complainant's consent that he might, under his then existing licenses, make larger and more highly finished machines. He did not ask the right to use another one of the many patents which the complainant owned, as the defendant was all the time insisting, apparently with the acquiescence of the complainant, that all the patents belonging to complainant which he used, or had any use for in his business, expired before April 1, 1886, and were included in the two licenses taken by him June 13, 1883, and this license of December 1, 1884;

and it can hardly be deemed possible that the defendant, for the mere privilege of making those large machines for 14 months, would intelligently or understandingly have bound himself for all time, or at least for the longest-lived of complainant's patents, not to make machines which should come within the claims of any of these patents, and in regard to which he had had no dealings with the complainant.    We find in the correspondence that the defendant all the time insists that his license shall not extend beyond April 1, 1886, because all the patents he used would have then expired; and the only rational explanation of the defendant's conduct in signing this contract is that he supposed, as he fairly might from the correspondence and dealings between the parties, that when he surrendered and returned his license all relations with the complainant under it were ended.    The defendant, in his correspondence and in his negotiations, evidently treated the words "license" and "contract" as meaning the same thing; and had no idea there was anything in this instrument but a license, and the terms on which he should conduct himself under the license while it remained in force.    This was the natural conclusion that any unsuspecting man, not a lawyer, would have drawn from the instrument.    The defendant is not a lawyer, and in the negotiations of the terms of this contract of December 1, 1884, did not consult a lawyer; and any person who reads the instrument can readily understand that it takes some training and study to detect those vicious clauses, which the complainant now invokes the aid of a court of equity to enforce, as they lie ambuscaded in the several articles which make up the entire document, and which the defendant treated as a mere license, which was to end by its own terms on the 1st of April, 1886, and which he could surrender at will; and had evidently no thought that the instrument would have an after-life.

For reasons which defendant evidently did not then understand, but which are now perfectly clear, the complainant refused to indorse upon the old license then held by the defendant the permission which he asked to make the larger machines under the same patents he was then licensed to use, and insisted on the defendant taking a new license; and the defendant, if he read these elaborate and carefully worded clauses, evidently assumed they would only be operative while the license remained in force, and that when he surrendered it he terminated all the contract relations that the license created.    For instance, in article 8 of the contract of December 1, 1884, defendant is made specifically to admit the validity of all patents enumerated in the preamble to the contract, and each and every claim thereof, and complainant's title thereto; that the inventions claimed in patent No. 194,980, which is the Whitehead patent, granted September 11, 1877, for a balanced gear, whereby one driving-wheel of a tricycle may rotate faster than the other.    The Peters patent No. 197-289, which is for a laterally adjustable roller-bearing, neither of which patents are included in the licensing clause of either of said contracts, are embodied in the defendant's Columbia and Victor tricycles, and his Expert and Eolus machines; and further expressly admits that any machines or parts of machines constructed in a substantially similar man-

ner are or will be infringements of said patents; and that these admissions are unqualified, and may at any time hereafter be pleaded, or proved in estoppel of the defendant. And by the ninth article of said contract the defendant is made to agree—

"Not to make, use, or sell, directly or indirectly, either backbones bifurcated for a rear wheel, or balance gear, allowing two wheels abreast, differing speeds on curves, or bearings containing balls or rollers and laterally adjustable, or brakes combined with the handle-bars and front wheel, or cranks adjustable to different lengths of throw, or forks of tubular construction, or mud-shield for steering wheels, constructed to turn with the wheel, or pedals that are polygonal or offering two or more sides for the foot, or round, contractible rubber tires in grooved rims, or rims containing or adapted for rubber or elastic tires, or saddles, adjustable fore and aft, or saddles having a flexible seat and means of taking up the slack, or steering heads, open or cylindrical, with stop from complete turning, or leg-guards over front wheel, or rims of wrought metal tubing, and adapted to receive a tire, or rims composed of sheet metal with overlapping edges, or wheels containing hollow metallic rim and rubber tires, or steering spindle and fork inclined to each other at an angle, or two speed or power gears, or tangent spokes, or Warwick rims, or any other device or invention secured by either of these patents other than according to the permission, conditions, or description in paragraph numbered 'First' in this agreement, or as otherwise agreed in writing with the party of the first part; nor in any way, either directly or indirectly, dispute or contest the validity of the letters patent hereinbefore mentioned, or either of them, of the title thereto of the party of the first part."

—While the eleventh article of the contract contains this clause:

"No termination of this contract or any part of it shall release or discharge the party of the second part from any payment, return, liability, or performance which may have accrued, become due, or arisen hereunder prior to or at the date of such revocation or surrender, or from the obligations, admissions, and agreements contained in the sections hereof numbered 'Sixth,' 'Seventh,' 'Eighth,' 'Ninth,' and 'Eleventh' hereof, which are a part of the consideration for the granting of the license herein, and are irrevocable except by written consent of the party of the first part. * * * And, further, that if the party of the second part shall continue after such termination of license to make, sell, or use any machine, or substantial part thereof, containing either of the parts specifically referred to in section 'Ninth' hereof, or any invention in any form set forth and claimed in the letters patent aforesaid, or any of them, the said party of the first part shall have the right to treat the party of the second part either as a party to and in breach of this contract, or as a mere infringer."

—An agreement which, if it did not by its terms practically prohibit defendant from making bicycles and tricycles, or either, for all time clearly did so during the life of all complainant's patents, several of which had then been only issued a very few months, except at the will and pleasure of the complainant, and on its own terms; and it can hardly be conceived as possible that a sane man who was engaged in the business of a manufacturer of such machines, and who intended to continue in such business, would have signed such an agreement if he had fully understood its intended effect and purpose. The contract, read in connection with the letters in proof, shows, as it seems to us, that it was an artfully con-

trived snare to bind the defendant in a manner which he did not comprehend at the time he became a party to it.

Coming to the conclusion that this instrument was executed by the defendant under a mistaken understanding of the scope and operation of its terms, we are clear that it is so inequitable, and would operate so oppressively upon the defendant, that it ought not to be enforced in this court. This bill, in effect, seeks a specific performance of this agreement. It asks the court to enforce upon the defendant the admissions and covenants contained in this contract of December 4, 1884. Coming into a court of equity, the complainant must show a case that commends itself to the equitable consideration and sense of justice of the court. Justice STORY states the rule as follows:

"It is important to take notice of a distinction between the case of a plaintiff seeking a specific performance in equity, and the case of a defendant resisting such performance. We have already seen that the specific execution of a contract in equity is a matter, not of absolute right in the party, but of sound discretion in the court. Hence it requires a much less strength of case on the part of the defendant to resist a bill to perform a contract than it does on the part of a plaintiff to maintain a bill to enforce a specific performance. When the court simply refuses to enforce the specific performance of a contract, it leaves the party to his remedy at law. * * * But courts of equity do not stop here, for they will let in the defendant to defend himself by evidence to resist a decree where the plaintiff would not always be permitted to establish his case by the like evidence. For instance, courts of equity will allow the defendant to show that by fraud, accident, or mistake the thing bought is different from what he intended, or that material terms have been omitted in the agreement, or that there has' been a variation of it by parol."

Again, in Bigelow on Fraud, 390, it is said:

"Specific performance of an agreement is never compelled unless the case is free from the imputation of all deception. * * * The conduct of the person seeking it must be free from all blame. Misrepresentation, even as to a small part of the subject, will exclude him from relief in equity."

And again, at page 394, he says:

"There is a distinction between the exercise of jurisdiction for setting aside a contract and refusing execution. Equity will not carry hard or unreasonable bargains into execution. * * * The power of awarding specific execution * * * rests in sound judicial discretion, and will not be applied to cases that are hard, or unfair, or unreasonable, or founded upon a very inadequate consideration. The case may therefore be such that equity will neither decree execution for the one party, nor set aside the contract for the other. In such cases the contract stands, and the parties' must look to the courts of law for its enforcement or for defense."

Again, in 3 Pars. Cont. *414, it is said:

"Equity will not enforce a contract tainted with fraud on the part of the applicant. * * * Here equity can hardly be said to follow the law, because it goes further, for it requires perfect good faith, and will refuse specific performance of a contract if it were obtained by means of misrepresentation or misdirection, which would not be sufficient to avoid the contract at law. * * * A much stronger case is necessary to set aside an executed agreement on the ground of misrepresentation or concealment than is sufficient to induce a court of equity to refuse a specific performance of one that is executory. Indeed, as equity is never bound to give this relief, so it never will,

unless the justice of the case, as drawn from all its facts, demands it. Hence there must not only be an entire absence of fraud, but an equal absence of oppressiveness, and if a decree would operate more hardly than it should on the defendant, this would be sufficient reason for withholding it."

This rule cited from the text-books is abundantly supported by the adjudged cases. *Race* v. *Weston*, 86 Ill. 94; *Frisby* v. *Ballance*, 4 Scam. 299; *Mortlock* v. *Buller*, 10 Ves. 292; *Willan* v. *Willan*, 16 Ves. 83; *Joynes* v. *Stathom*, 3 Atk. 388.

We think there can be no doubt that this contract, if enforced according to its letter and spirit, would act oppressively and unjustly upon this defendant. He is a competing manufacturer in the same field with the complainant. He is the owner of patents which the complainant has acquiesced in his right to use in conducting his business, and covering many, if not all, the features in his machines enumerated in the ninth article of the contract; and we cannot but look upon this article and the other provisions of the contract as a cunning device to bind this defendant, not only in a manner which he did not comprehend or understand at the time he executed the agreement, but also in a manner which would be contrary to public policy; as we think the courts should certainly not favor any efforts on the part of patentees or owners of patents to obtain by indirection or subterfuge an admission as to the validity of their patents which ties the hands and cripples the energies of a competitor. Many of these patents held by complainant, and perhaps all of them, may be valid for their specific devices, but the law should not encourage parties holding such patents to invent or devise schemes by which to obtain admissions, directly or indirectly, of the validity of their patents, so as to foreclose investigation and discussion upon the question of their validity; and hence we simply say that this contract seems to be so oppressive, and so unjust and inequitable in its terms, and so contrary to sound public policy, that it ought not to be enforced in a court of equity, even if the defendant fully understood and comprehended the force and import of every paragraph of it.

The bill is therefore dismissed for want of equity.