PRUDENTIAL LIFE INSURANCE COMPANY OF AMERICA, In Equity,

*vs.*

NORBERT LACHANCE AND HELEN A. LASANTE.

Cumberland.    Opinion August 28, 1915.

*Assignment.    Beneficiary.    Equity.    Insurance.    Interpleader.    Policy.
Proofs of Death.*

The policy in this case was assigned by Joseph W. LaSante to Norbert LaChance to secure a loan of $2500, as claimed by Helen A. LaSante, the beneficiary under said policy.    The assignee, Norbert LaChance, claimed the full amount of the policy.

*Held:*

1.    That mere inadequacy of price will not render a contract void when both parties are in a condition to form an independent judgment concerning the transaction and intentionally make the contract, and there are no inequitable incidents connected with the transaction.

2.    Equity does refuse to enforce a contract, even though legal, in which the party seeking the redress has so far overreached his adversary that the contract is unconscionable.

3.    It is wisely established in the courts of Chancery, to prevent taking surreptitious advantage of the weakness or necessities of another, which knowingly to do is equally against conscience, as to take advantage of his ignorance.

4.    There may be such an unconscionableness or inadequacy in the bargain as to demonstrate some gross imposition or some undue influence; and in such cases courts of equity ought to interfere, upon the satisfactory ground of fraud.

5.    Although the actual cases in which a contract or conveyance has been cancelled on account of gross inadequacy merely, without other inequitable incidents, are very few, yet the doctrine is settled by a consensus of decisions that, even in the absence of all other circumstances, when the inadequacy of price is so gross that it shocks the conscience and furnishes satisfactory and decisive evidence of fraud, it will be a sufficient ground for cancelling a conveyance or contract whether executed or executory.

On report.    Decree according to the opinion.

This is a bill of interpleader filed by the Prudential Life Insurance Company, the plaintiff in equity, asking the court to direct it as to

which party claimant shall receive the proceeds of a certain policy issued upon the life of one Joseph W. LaSante. At the hearing of said cause, by agreement of the parties, this case was reported to the Law Court for decision upon bill, answer and so much of the evidence as is legally admissible, the court to render such judgment as the rights of the parties require.

The case is stated in the opinion.

*Charles J. Nichols,* for complainant.

*Joseph R. Paquin, and Emery & Waterhouse,* for LaChance.

*J. J. McAnarney, and Augustus F. Moulton,* for LaSante.

SITTING: SAVAGE, C. J., SPEAR, KING, BIRD, HALEY, HANSON, JJ.

HALEY, J. This is a bill of interpleader, filed by the Prudential Life Insurance Company of America against Norbert LaChance and Helen A. LaSante, alleging that on the 28th day of November, 1911, the company issued its policy of insurance upon the life of Joseph M. LaSante for the sum of $5000, and which afterwards was corrected by the company so that the name in the policy was Joseph W. LaSante, payable in case of death to Helen LaSante, the wife of the insured, if the beneficiary survived the insured, otherwise to the executors, administrators or assigns of the insured; that, at the time the company corrected the error in the name of the insured it also corrected an error in the name of the beneficiary, so that the policy was payable to Helen A. LaSante; that, on the 29th day of May, 1913, said Joseph LaSante died at Quincy, in the Commonwealth of Massachusetts; that proofs of his death, upon blanks furnished by the company, had been filed with the company; that said Norbert LaChance claimed the amount payable, according to the terms of the policy, by virtue of an assignment dated May 16, 1913, from Joseph W. LaSante and said Helen A. LaSante to said Norbert LaChance, and had brought suit at law against the insurance company for the full amount of said insurance policy; that the insurance company had received a notice in writing, signed by the said Helen A. LaSante, stating that the assignment of the policy above mentioned to said Norbert LaChance was made as security for a loan of $2500, and demanded payment, as beneficiary under said policy, of the difference between the face value of the policy and the amount of the loan, plus the interest thereon. The insurance company prayed that said Helen

A. LaSante and said Norbert LaChance be decreed to interplead touching their several claims; that said action at law be enjoined, and that it be relieved from liability upon paying into court the sum of money due by the terms of the policy.

The defendants appeared; filed their answers to the bill of interpleader, and upon hearing it was ordered that the insurance company be discharged from all liability to either of the defendants, Norbert LaChance or Helen A. LaSante, by depositing with the clerk $4986.05, and that the defendants interplead touching their claims to said fund.

The money was paid into court, the defendants' answers to the bill were by agreement taken as their pleadings, the testimony was taken by the court, and the case reported to this court for final decision.

Mr. LaSante was a resident of Quincy, Mass., engaged in the grocery and provision business in that city, and on the first day of November, 1912, began treatment with his family physician, Dr. Burke, at which time he was suffering from a stroke of paralysis and arteriosclerosis, and soon developed Bright's disease, from which he afterwards died. At that time his family consisted of his wife and two small children. In November he was unable to attend to his business, and it was sold out before the first of January, 1913, before which time his disease had progressed so far that his mind was somewhat affected, and his eyesight much affected. From November, 1912, to the time of his death, he suffered from intense headaches and grew rapidly worse. In April, 1913, his disease had progressed to such an extent that his physicians were expecting convulsions; he was discharging a large amount of albumen, and his eyesight was very much affected, so that on May 16th, 1913, when the assignment was executed, he could not raise himself in bed and was practically blind, and to sign the papers he was raised up in bed, and held by the agent of the insurance company that issued the policy, the pen placed in his hand and upon the assignment for him to sign. After signing the assignment Mr. LaSante did not leave his bed, and in three days became unconscious and remained so until his death on May 29th. The doctor testified: "The man was incompetent to do business, in my estimation, at any time, in any way, shape, form or manner. His judgment was of no value whatever. His talk was incoherent." The above testimony refers to a period of two weeks before Mr. LaSante's death.

Norbert LaChance resided at Biddeford, Maine, and his wife was a sister to Mr. LaSante, and Mr. LaChance must have known the condition of Mr. LaSante, because he claimed that he called upon Mr. LaSante in December, 1912, and in March, 1913, Mrs. LaSante wrote to Mrs. LaChance, returning an insurance policy that Mr. LaChance had taken from her to show to his brother, beginning her letter with these words: "Very Dear Brother and Sister-in-law, . . . . I send you your life insurance policies. They are good policies if you can keep them. Do everything in your power to retain them, but if you cannot continue to pay them, Norbert tells me that he will pay the premiums for you," and the letter closed with these words, "Your sister and Brother-in-law, who love you. Norbert and Marie." Norbert LaChance claimed that he called upon the LaSantes with his wife in March, at which time Mr. LaSante's condition was such that Mrs. LaChance wrote her father that Joseph was dying and to come at once. In April Mr. LaChance again called upon the LaSantes, and he claims that when he was there previously Mr. LaSante desired to borrow $150 of him, but that he did not loan it to him, but that at the call in April he loaned him $500 and insisted upon a condition that in the event of the death of Mr. LaSante he should be paid $500 for the use of the money. At this time a neighbor was called in by Mrs. LaSante, whose testimony corroborates the testimony of Mrs. LaSante, who said that Mr. LaChance desired to loan them $500, for which he wanted an insurance policy as security and it was talked there in the presence of the parties that Mr. LaChance should loan them $500 with the condition that if Mr. LaSante lived he would repay the money with six per cent. interest, that if he died Mr. LaChance was to take $1000. To this the neighbor strenuously objected, and a note was prepared for the $500, bearing interest at eight per cent., without any provision for a thousand dollars in case of the death of Mr. LaSante, and the policy was taken as collateral, although not assigned; but at the time of this loan Mrs. LaSante protested against it and stated that they did not need the money, that they had money in the house and rents coming in, and she turned the money over for safe keeping to the agent of the insurance company, who afterwards paid her what she called for, and after the death of Mr. LaSante paid her the balance.

The next week, May 7th, Mr. LaChance again called and stated the collateral was not good without an assignment, and had other

talk with Mr. LaSante, who was at that time confined to his bed.
And it is claimed that, at that time, Mr. LaSante and his wife agreed
to sell to Mr. LaChance the $5000 policy for $2500, and, at his dicta-
tion, Mrs. LaSante wrote a letter to the insurance company, stating
they wished to assign the policy and asked for the proper blanks.
In a few days the blanks arrived, and Mr. LaChance again came to
Mr. LaSante's took the blank assignments and left the house.    In
about an hour he returned, accompanied by the agent of the insur-
ance company, and turned over a $2000 check and the $500 note
above mentioned as the $2500 consideration for the assignment of
the policy, the assignment blank having been filled out while in Mr.
LaChance's possession.    The agent of the insurance company raised
Mr. LaSante up in bed and held him, the pen was placed in his hand
and upon the assignment and Mr. LaSante wrote his name, and Mrs.
LaSante afterwards signed it and the insurance agent witnessed their
signatures.    The assignment was forwarded to the insurance com-
pany by Mr. LaChance, who at once returned to his home in Bidde-
ford.    The LaSantes had no use for the $2000, not having then used
up the $500 previously loaned them and left by them in the insurance
agent's hands.    The check for $2000 was then endorsed and turned
over to the agent of the insurance company, who had assisted Mr.
LaSante in executing the so-called assignment as above stated, and
deposited in the bank to his own credit, and, after the death of Mr.
LaSante, upon the request of the widow of Mr. LaSante, he turned
over to her the proceeds of said check.

The real issue is the validity of the assignment of May 16th.    We
think it is void as an unconscionable contract for constructive fraud
in the procuring of it.    "Equity does refuse to enforce a contract,
even though legal, in which the party seeking the redress has so far
overreached his adversary that the contract is unconscionable."
*Brick* v. *Gas Co.*, 82 Kan., 752.    Pomroy's Eq. Juris., Sec. 922.    In
the celebrated case of *Chesterfield* v. *Jansen*, 2 Ves. Sr., 155, decided in
1750, Lord Hardwicke arranged all the forms of frauds that courts of
equity had jurisdiction to relieve against in four classes, the first
three of which are as follows:    "First, fraud, which is *dolus malus* may
be actual, arising from facts and circumstances of imposition, which
is the plainest case.    Second, it may be apparent from the intrinsic
nature and subject of the bargain itself; such as no man in his senses,
and not under delusion, would make on the one hand, and as no

honest and fair man would accept on the other; which are inequit-
able and unconscientious bargains, and such that even the common
law has taken notice.   Third, fraud, which may be presumed from
the circumstances and condition of the parties contracting; and this
goes further than the rule of law, which is, that it must be proved, not
presumed.   But it is wisely established in the courts of chancery, to
prevent taking surreptitious advantage of the weakness or necessities
of another, which knowingly to do is equally against conscience, as
to take advantage of his ignorance.   Fourth, fraud, which may be
collected and inferred, in the consideration of a court of equity, from
the nature and circumstances of the transaction, as being an imposi-
tion and deceit on other persons, not parties to the fraudulent agree-
ment."   Included in the above are frauds in what are called
catching bargains with heirs, reversioners, or expectants in the life
of the parent.

This statement has been approved, unchanged, by the courts and
text writers to the present day.   Story's Eq. Juris., Sec. 188; Pom-
roy's Eq. Juris., Sec. 924; *Hume* v. *U. S.*, 132 U. S., 406.

Mere inadequacy of price will not render a contract void when
both parties are in a condition to form an independent judgment con-
cerning the transaction and intentionally make the contract, and
there are no inequitable incidents connected with the transaction.
"Still, however, there may be such an unconscionableness or inade-
quacy in the bargain, as to demonstrate some gross imposition or
some undue influence; and in such cases courts of equity ought to
interfere, upon the satisfactory ground of fraud.   But then such
unconscionableness for such inadequacy should be made out, as
would (to use an expressive phrase) shock the conscience, and
amount in itself to conclusive and decisive evidence of fraud.   And
where there are other ingredients in the case of a suspicious nature, or
peculiar relations between the parties, gross inadequacy of price must
necessarily furnish the most vehement presumption of fraud."
Story's Eq., Sec. 246.

"Hence it is, that, even if there be no proof of fraud or imposition;
yet, if upon the whole circumstances, the contract appears to be
grossly against conscience, or grossly unreasonable and oppressive,
courts of equity will sometimes interfere and grant relief, although
they certainly are very cautious of interfering, unless upon very
strong circumstances."   Story's Eq., Sec. 331.

"Although the actual cases in which a contract or conveyance has been cancelled on account of gross inadequacy merely, without other inequitable incidents, are very few; yet the doctrine is settled by a consensus of decisions and *dicta*, that, even in the absence of all other circumstances, when the inadequacy of price is so gross that it shocks the conscience, and furnishes satisfactory and decisive evidence of fraud, it will be a sufficient ground for cancelling a conveyance or contract whether executed or executory." Pomroy's Eq., Sec. 927. Kerr on Fraud and Mistake, 187.

Lord Thurlow in *Gwynne* v. *Heaton*, 1 Brown's Ch. R. 9, in speaking of the inadequacy of consideration that renders contracts void, said: "It must be an inequality so strong, gross and manifest, that it must be impossible to state it to a man of common sense, without producing an exclamation at the inequality of it."

"Whenever a deed or writing ought not to be used, it is against conscience for the party holding it to retain it." *Wilson* v. *Getty*, 57 Penn., 266; *Howard* v. *Edgell et al.*, 17 Vt., 9.

"The circumstances attending the making of the contract must be such as to excite suspicion of fraud, imposition, misrepresentation, or undue influence, on the one side, and imbecility, credulity or blind confidence, on the other. *Dailey* v. *Jessup*, 72 Mo., 144, and that equity will grant relief where there are such elements as absence of consideration, reliance upon the representation of the other party, surprise, mutual mistake, and unconscionable advantage. *Griffith* v. *Twomley*, 69 Mo., 13; *Faust* v. *Birner*, 30 Mo., 414." *Nelson* v. *Betts*, 21 Mo., App., 219.

The monstrous disproportion between the benefit which the plaintiff received and the right with which she parted. . . . . cannot fail to arrest attention and is, to say the least, strong evidence of fraud and imposition on the part of the defendant. *Nelson* v. *Betts*, supra.

An examination of the authorities show that equity protects the weak, the feeble, the inexperienced and the oppressed, from the strong, the shrewd and crafty, by refusing to uphold contracts or conveyances, when the relation or condition of the parties at the time of the making of the contract, or the gross inadequacy of the consideration, or the circumstances surrounding the transaction, are such as lead to the presumption of fraud, imposition or undue influence. In this case many of the elements which separately are sufficient to authorize the

court to relieve a party from a contract or conveyance are present. The intrinsic nature and subject of the bargain itself, the gross inadequacy of the consideration, the relationship of the parties— brothers-in-law and sister-in-law—, the circumstances of making the loan of $500, the negotiations for the execution of the assignment with a man in the physical and mental condition of Mr. LaSante, the condition of Mrs. LaSante when the contract was executed, worn and distracted by grief and the care and nursing of her dying husband, and the prospects of the future for herself and minor children, the fact that the assignors had no use for the money paid for the assignment, and that both husband and wife were without disinterested advice or counsel, compels the court to pronounce the assignment unconscionable and void.

In arriving at the above conclusion we have duly considered the argument for Mr. LaChance, that, at the time the assignment was executed, the insurance agent asked the assignors if they understood what they were doing, and stated that if Mr. LaSante died they could get nothing from the policy, and they both said "Yes." Mrs. LaSante admits that she said "yes," but states that her husband was "too far gone to answer," and that she supposed she was merely making the loan that Mr. LaSante had negotiated for. But, even if it were possible that both understood the transaction, the assignment ought not to be enforced, for, as said in *Pope Mfg. Co.* v. *Gormully,* 34 Fed., 877, where the same claim was urged in regard to a contract that had been executed; "This contract seems to be so oppressive and so unjust and inequitable in its terms, and so contrary to sound public policy, that it ought not to be enforced in a court of equity, even if the defendant fully understood and comprehended the force and import of every paragraph of it."

As the assignment is without validity, the parties are entitled to be placed in *statu quo.* Mr. LaChance, having advanced $2500, which the assignors received, is entitled to a return of his money as a loan, with interest at six per cent. to the date that the money was paid into court by the insurance company, plus $13.95 for one premium that he paid upon the insurance policy. The balance of the fund should be paid to Mrs. LaSante, together with her taxable costs to be deducted from the sum due Mr. LaChance.

*Decree according to the opinion.*

# MEMORANDUM DECISIONS

## CASES WITHOUT OPINIONS